UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAKEENAH MCCULLOUGH, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>XEROX CORPORATION,<br><br>Defendant. | Case No. 13-cv-04596-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT, REGARDING SAKEENAH MCCULLOUGH**<br><br>Re: Dkt. No. 41 |

I.    **INTRODUCTION**

        This is an employment discrimination case brought by Plaintiffs Sakeenah McCullough and Daniel Gunther against Defendant Xerox Corporation and various Doe defendants.  Both Plaintiffs assert causes of action for race discrimination, unlawful retaliation, declaratory relief, and wrongful termination under California's Fair Employment and Housing Act, Cal. Gov't Code § 12920 et seq. ("FEHA").  McCullough also asserts causes of action for unlawful disability discrimination, refusal to provide reasonable accommodations, and refusal to engage in the interactive process under FEHA.  After Plaintiffs filed their First Amended Complaint ("FAC"), Xerox removed the action to this Court.  *See* Dkt. No. 1.[1]  Now before the Court is Defendant's motion for summary judgment as to McCullough, on which the Court heard oral argument on

_____

[1] Plaintiffs allege unspecified damages for lost wages and benefits, emotional distress, punitive damages, and attorneys' fees and costs.  *See* FAC ¶¶ 61, 71, 88, 97, 106, 115 and Prayer for Relief (Ex. A).  The parties are completely diverse, and Plaintiffs do not dispute that the $75,000 jurisdictional amount is met.  *See Simmons v. PCR Tech.,* 209 F. Supp. 2d 1029, 1035 (N.D. Cal. 2002) (denying motion to remand in an employment discrimination case where damages were not specified and finding that "while attorneys' fees alone would not necessarily exceed $75,000, when viewed in combination with alleged compensatory, punitive, and emotional distress damages, the jurisdictional minimum is clearly satisfied").

United States District Court
Northern District of California

1   April 30, 2015.  Dkt. No. 41.  After carefully considering the parties' written and oral arguments,

2   the Court hereby GRANTS IN PART and DENIES IN PART Defendant's motion for summary

3   judgment or, in the alternative, partial summary judgment regarding McCullough.

4   **II.      EVIDENTIARY OBJECTIONS**

5         Both parties raise objections to the evidence submitted in relation to Defendant's motion.

6   Plaintiff's evidentiary objections fail to comply with Civil Local Rule 7-3(a) because they were

7   not included within her opposition brief.  As a result, the Court OVERRULES Plaintiff's

8   evidentiary objections for failure to comply with the Local Rules.

9         Defendant argues that Plaintiff's evidence regarding her work performance leading to her

10   termination is "inadmissible because it lacks personal knowledge, is speculative, argumentative,

11   conclusory, contains hearsay and constitutes impermissible legal conclusions."  Reply at 8 n. 9,

12   Dkt. No. 61.  As a threshold matter, Defendant's evidentiary objections are not sufficiently

13   specific to enable the Court to properly consider them.  Defendant's blanket objections to

14   McCullough's evidence do not specify which portions of testimony or other evidence Defendant

15   believes must be excluded.  Moreover, Defendant does not identify the particular rule of evidence

16   or authority that corresponds to each allegedly inadmissible statement so as to allow the Court to

17   understand the basis for the objections.   As a result, "it is not possible for the Court to fairly

18   evaluate the objections."  *Schaeffer v. Gregory Vill. Partners*, 2015 WL 2267813, at *5 (N.D. Cal.

19   May 14, 2015).  In addition, to the extent Defendant objects to Plaintiff's declaration because it is

20   "self-serving and uncorroborated," the Court rejects that argument.  Reply at 8 n. 9; *see Nigro v.*

21   *Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) ("Although the source of the evidence

22   may have some bearing on its credibility and on the weight it may be given by a trier of fact, the

23   district court may not disregard a piece of evidence at the summary judgment stage solely based

24   on its self-serving nature.").  Therefore, the Court overrules Defendant's vaguely asserted

25   objections to McCullough's evidence without prejudice to the assertion of proper objections, made

26   to specific statements, at the time of trial or in connection with a future motion.

27

28

United States District Court
Northern District of California

2

United States District Court
Northern District of California

### III.   STATEMENT OF FACTS[2]

McCullough, an African-American woman, was hired by Xerox as a full-time Customer Service Representative in October 1999, following a period of work as a part-time intern. Declaration of Sakeenah McCullough ("McCullough Decl.") ¶ 2, Dkt. No. 49.  She was promoted to Sales Representative in 2000, and held that position until approximately December 15, 2011, when she was terminated.[3]  *Id.*  During the course of her employment at Xerox, McCullough contends she suffered various forms of discriminatory treatment and retaliation on account of her race and disability.

#### A.   McCullough's Allegations of Racial Discrimination

##### 1.   Sales Territory Assignments and Quota Determinations

McCullough claims that Xerox assigned "unfair and inequitable" territories and unreasonable quota requirements to African-Americans as compared to white employees. Compendium of McCullough Deposition Exhibits ("Compendium"), Ex. 60, Dkt. Nos. 42-3 to 42-5.  Xerox conducted "viability analyses" each year with respect to sales territories.  Declaration of Kerry McInerney Freeman ("Freeman Decl."), Ex. A ("McCullough Dep.") at 458:6-21, Dkt. No. 42-1; Declaration of Elizabeth Riles ("Riles Decl."), Ex. 2 ("Stasher Dep.") at 38:4-9; 38:24-39:22, Dkt. No. 51.  In conducting these analyses, Xerox could remove or add certain accounts to make any Sales Representative's territory "viable."  Declaration of Aaron Hunt ("Hunt Decl.") ¶¶ 5, 9-12, Dkt. No. 43-3; *see* Declaration of Jesse Stasher ("Stasher Decl.") ¶¶ 25-26, Dkt. No. 43-8; Declaration of Jean-Charles Alavarez ("Alvarez Decl.") ¶¶ 41, 42, Dkt. No. 43-7.  McCullough contends that in conducting the viability analyses, managers deliberately made African-Americans' sales territories more difficult either by removing lucrative accounts or by giving African-Americans unfair quotas.  Compendium, Exs. 34, 60; McCullough Dep. at 458:6-21, Dkt. No. 42-1.

McCullough asserts that the transfer of some of her accounts to white employees and her

---

[2] The following Statement of Facts assumes all inferences in Plaintiff's favor.

[3] At some point, Xerox renamed Sales Representatives "Solution Sales Executives."  McCullough Decl. ¶ 2.  For the sake of clarity, the Court uses the "Sales Representative" designation throughout this Order.

United States District Court
Northern District of California

1    assignment to challenging sales territories were indicators of racially disparate treatment.  For

2    example, McCullough was first assigned to a sales territory that included a number of Kaiser

3    facilities in San Francisco and the East Bay.  McCullough Decl. ¶ 4.  The Kaiser account could be

4    a lucrative assignment because Kaiser purchased a high volume of equipment, but it was also a

5    difficult one due to Kaiser's overlapping assignment of procurement responsibilities to national

6    and local teams.  Stasher Decl. ¶ 3; Stasher Dep. at 36:19-37:19, Dkt. No. 51.  McCullough's

7    manager, Jesse Stasher, credited her with Xerox's "successes" on the account.  Stasher Dep. at

8    36:19-21, Dkt. No. 51; Stasher Decl. ¶ 3.  Notwithstanding the challenging nature of the territory,

9    McCullough fulfilled her sales quotas for 2001, 2002, and 2003, but in 2003 Xerox added

10   Lawrence Raleigh, a white employee, to the territory.  McCullough Dep. at 169:20-22, Dkt. No.

11   42-1; Stasher Decl. ¶ 3.

12        After receiving complaints about McCullough from Kaiser, Xerox removed her from the

13   sales territory altogether in April of 2007.  Stasher Decl. ¶¶ 3-4; McCullough Decl. ¶ 4; Riles

14   Decl., Ex. 1 ("McCullough Dep.") at 174:5-13, Dkt. No. 51.   According to Stasher, the problems

15   with the Kaiser account were not solely or predominantly due to McCullough's performance, but

16   he nonetheless "had to remove [her] from the entire territory."  Stasher Decl. ¶ 4; McCullough

17   Decl. ¶ 4; Stasher Dep. at 35:17-37:18, Dkt. No. 51.  Stasher told McCullough that "there was a

18   'witch hunt' against [her] by the Kaiser National Account Team."  McCullough Decl. ¶ 4.

19   McCullough was replaced on the Kaiser account by Dave Roberts, a white employee.  Stasher

20   Decl. ¶ 19; Stasher Dep. at 51:18-21, Dkt. No. 51.

21        McCullough's next territory assignment consisted primarily of financial services accounts,

22   including a large number of Wells Fargo banks.  McCullough Decl. ¶ 5.  According to

23   McCullough, the 2008 recession affected her ability to successfully sell to these financial services

24   accounts, but no adjustment was made to her quota.  *Id.*  In addition, many of Wells Fargo's

25   purchasing decisions were made by the company's national office rather than on the local level,

26   requiring substantial effort to locate local banks within her territory that were authorized or willing

27   to make individual purchases.  *Id.*; *see also* Stasher Dep. at 47:18-49:8, Dkt. No. 51; Stasher Decl.

28   ¶¶ 3, 19.  McCullough's quotas were not adjusted to account for this difficult aspect of the

4

territory.  McCullough Decl. ¶ 5.

McCullough contrasts her experience with the Kaiser and Wells Fargo accounts with that of Roberts, the white employee who replaced her on the Kaiser account.  When McCullough was assigned to the Kaiser account, she was expected to sell Xerox products to Kaiser and was subject to sales quotas.  Stasher Decl. ¶ 3.  By contrast, when Roberts was assigned to the Kaiser account, he was not expected to meet sales quotas.  Stasher Decl. ¶ 19.  According to Xerox, this was because by the time Roberts was responsible for the account, Kaiser had started a procurement process that resulted in its business being awarded to one of Xerox's competitors, such that Roberts was "prohibited from selling to Kaiser."  Stasher Dep. at 34:18-21, Dkt. No. 51; Stasher Decl. ¶ 19.  Stasher contends that under the circumstances he felt it would be unfair to "penalize [Roberts] for not selling more."  Stasher Decl. ¶ 19.  McCullough contends that she did not receive any comparable accommodation with regard to what she maintains was the similarly challenging Wells Fargo account.  McCullough Decl. ¶ 5.[4]

### 2. Unfair Management of Xerox's Performance Improvement Plan ("PIP")

McCullough also contends that she was treated in a discriminatory manner under Xerox's disciplinary or probationary program, the Performance Improvement Plan or "PIP."  In March of 2009, after Julie Hogan, a white employee, was promoted to Regional Vice President of the Western Region, Stasher placed McCullough on a PIP, citing her sales performance.  Stasher Decl. ¶ 13; McCullough Decl. ¶ 6.  McCullough reached over 116% of her sales plan for the second quarter of 2009, which concluded at the end of September, but she was not removed from the PIP.  McCullough Decl. ¶ 6.  According to Stasher, he would have liked to have taken McCullough off the PIP, but he could not remember if he was "allowed to" and believed he needed to see more "sustainable performance" from her before he could do so.  Stasher Dep. 119:20-22, Dkt. No. 51.  By contrast, Catherine Matthews, a white employee, was removed from the PIP when she exceeded her quota for a quarter and, in Stasher's view, "appeared to be trending

---

[4] McCullough also contends that Xerox removed accounts from other African-American employees and gave those accounts to white employees, resulting in "low performance and lost commissions" for African-Americans.  Compendium, Ex. 60.

United States District Court
Northern District of California

up." Stasher Decl. ¶ 18(a).  McCullough contends that Stasher did not remove her from probation because, in his words, Hogan would not allow him to.  McCullough Decl. ¶ 7.

In 2008 or 2009, Stasher, who is African-American, was himself placed on a PIP even though his performance was "higher than other managers" who were not subject to a PIP.  Stasher Dep. at 67:11-20, Dkt. No. 51.  For part of the time he was on the PIP, Stasher was reporting to Hogan.  *Id.*; Stasher Decl. ¶ 11.   Stasher retired in October of 2009.  Declaration of Julie Hogan ("Hogan Decl.") ¶10, Dkt. No. 43-10.  As of the time he retired, he did not have the intention to terminate McCullough.  Stasher Dep. at 71:14-17, Dkt No. 51.

### 3.      Statements by Stasher Regarding the Treatment of African-American Employees

In addition to her own personal experience regarding sales territories, quotas, and the PIP process, McCullough contends that several comments made to her by her then-manager, Stasher, reflect discriminatory attitudes towards African-American employees at Xerox.  McCullough says that Stasher told her (1) that he felt whites at Xerox were "let off the hook, but not African-Americans;" (2) that he "was not going to fire all the Black people;" and (3) that he was asked to fire Russell Wiggins (an African-American employee who reported to Stasher), but refused. McCullough Decl. ¶ 8; Stasher Dep. at 70:3-7, Dkt. No. 51.  Stasher acknowledges that he would not fire Wiggins (though he does not recall whether he was asked to do so) (Stasher Dep. at 66:14-67:2, Dkt. No. 51); denies that he was ever asked to fire any of the sales representatives on his team (*id.* at 69:21-23, Dkt. No. 42-1); and does not recall making the other statements (*id.* at 66:14-18, Dkt. No. 42-1; 69:24-70:1, Dkt. Nos. 42-1, 51).

### 4.      McCullough's Formal Complaints

After Stasher's retirement in October of 2009, McCullough says that she became increasingly concerned that she was "being treated unfairly and in a discriminatory manner," and started to raise these concerns with her superiors and Xerox's diversity manager.  McCullough Decl. ¶¶ 9-12, 19.  McCullough contends that Xerox did not adequately investigate these complaints, and argues that this failure was further evidence of Xerox's discriminatory motives. Around the time McCullough started to raise these discrimination complaints, Hogan became

1    McCullough's direct supervisor for approximately a month, until Jean-Charles Alvarez, Stasher's

2    replacement, stepped into that role.  Hogan Decl. ¶¶ 10-12.  Hogan believed McCullough to be a

3    "historical non-performer" on Stasher's former team.  Hogan Decl. ¶ 9.  She met with

4    McCullough to discuss her performance, and sent her a letter outlining performance expectations

5    for the fourth quarter of 2009 (October-December).  Hogan Decl. ¶ 12; Compendium, Ex. 31.

6    While Hogan was supervising McCullough, she extended McCullough's time on the PIP.  Hogan

7    Decl. ¶ 11.

8            Around this time, McCullough reached out to Xerox's diversity manager, Ernest Hicks,

9    contending that she was being treated differently due to her race.  McCullough Decl.  ¶ 10.

10   Instead of investigating her complaint directly, Hicks directed McCullough to address her

11   concerns with Ms. Hogan.  *Id.*  McCullough then wrote to Hogan in December 2009 stating that

12   she was being treated unfairly at Xerox "due to one or the combination of [her] ethnicity, gender

13   and age."  Compendium, Ex. 34; Hogan Decl. ¶ 15.  McCullough copied Alvarez, her new

14   manager, and Richard Hillman, a human resources consultant to Xerox, on the correspondence.

15   Compendium, Ex. 34.  In the letter, McCullough referenced what she characterized as the

16   underperformance of other sales representatives, asked whether those representatives were on

17   probation, and asked whether her own probation extensions were consistent with how other

18   employees were treated.  *Id.*; Hogan Decl. ¶ 15; McCullough Decl. ¶ 11.  McCullough also raised

19   questions regarding the manner in which territories and accounts were assigned to her and another

20   African-American employee.  Compendium, Ex. 34.  After reading the letter and consulting with

21   her sales managers, Hogan concluded that McCullough's concerns were "without merit."  Hogan

22   Decl. ¶ 15.

23           McCullough contends that Xerox management had multiple opportunities to respond to her

24   discrimination complaints, but did not.  For instance, Hogan met with McCullough "within two

25   business days" of receiving the letter, but focused her discussion on the criteria for the PIP process

26   and not McCullough's discrimination concerns.  McCullough Decl. ¶ 12.  Similarly, Hillman met

27   with McCullough but did not address her discrimination concerns, instead focusing on how she

28   obtained information regarding other employees' sales performances.  McCullough Decl. ¶ 12;

United States District Court
Northern District of California

7

United States District Court
Northern District of California

Riles Decl., Ex. 7 ("Hillman Dep.") at 64:14-65:24, Dkt. No. 51.   Hogan and Alvarez jointly met with McCullough to discuss her progress on the PIP and performance expectations, but neither directly focused on the allegations regarding racially disparate treatment raised in her letter. Alvarez Decl. ¶ 8; Compendium, Ex. 33; Hogan Decl. ¶ 16; McCullough Decl. ¶ 12.   Finally, McCullough received a formal feedback letter from Hogan and Alvarez after the meeting indicating that if she failed to meet the performance goals outlined in the letter, she could be terminated on or before December 31, 2009.   Compendium, Ex. 35.   The letter did not mention McCullough's discrimination complaints.   *Id.*

### 5.   Failure to Accommodate and Retaliation

On December 17, 2009, the day after she received the feedback letter, McCullough scheduled an appointment to see her doctor for depression, anxiety, insomnia and heart palpitations – symptoms she attributed to "months of enduring what [she] felt was discrimination and unfair treatment."   McCullough Decl. ¶ 13.   Following the appointment, under instructions from her doctor, McCullough applied for and received disability leave from Xerox from approximately December 15, 2009 to September 27, 2010.   Declaration of Judy Gauger ("Gauger Decl.") ¶ 3, Dkt. No. 43-9; McCullough Decl. ¶ 13.   Before and after McCullough returned from her first disability leave in September of 2010, she made certain requests for workplace accommodations, a number of which were denied.   McCullough contends that these denials amounted to retaliation against her for voicing her concerns regarding discrimination.   *See* Compendium, Ex. 60.

### a.   First Request for Accommodations

After being informed, in August of 2010, that she was no longer eligible for short term disability benefits, McCullough provided Xerox with an authorization from her doctor indicating that her work week needed to be limited to four eight-hour days.   McCullough Decl. ¶ 14 and Ex. 1; Compendium, Ex. 77.   The following month, McCullough's doctor sent Xerox an additional letter responding to questions posed by the company's Disability Manager, Judy Gauger, regarding McCullough's diagnosis and prognosis.   Compendium, Ex. 314.   The letter reiterated that McCullough needed three consecutive rest days away from work, but noted that she was

United States District Court
Northern District of California

expected to recover "substantial function in the ensuing months." *Id.*; *see also* Gauger Decl. ¶ 7. Gauger interpreted McCullough's doctor's conclusion that McCullough would regain "substantial function in the ensuing months" as a request for open-ended, indefinite part-time work. Riles Decl., Ex. 8 ("Gauger Dep.") 41:16-25, Dkt. No. 51. She consulted with McCullough's managers, Alvarez and Hogan, and Hillman, the human resources consultant, regarding the availability of part-time sales positions (even though McCullough never requested a permanent part-time position), and concluded none were available. Gauger Dep. at 42:2-10; Gauger Decl. ¶ 7. Gauger did not discuss any other potential accommodations with Hillman, Alvarez or Hogan. Gauger Dep. 42:21-25. During the course of these conversations with Gauger, Alvarez and Hogan expressed their belief that McCullough "was on leave to avoid discipline." Gauger Dep. 65:11-16. Having determined that McCullough was not eligible for further leave and that no part-time positions were available, Gauger informed McCullough that she was expected to return to work full-time by September 27, 2010. McCullough Decl. ¶ 14 and Ex. 2.

### b.    Second Request for Accommodations

With her doctor's recommended request denied, McCullough sought other accommodations. McCullough asked (1) not to be immediately placed in a quota-bearing position, (2) to be removed from her PIP for six months, (3) to be taken off probation, and (4) to be paid 100% salary (as opposed to the customary 80% salary-20% commission split for sales positions). Hogan Decl. ¶ 19. These requests were denied. Gauger Decl. ¶ 8; Alvarez Decl. ¶ 17; Hogan Decl. ¶ 19.

McCullough returned to work on September 27, 2010. She reached 221% of her goal for October 2010, but suffered a relapse and was placed back on medical leave on November 8, 2010. McCullough Decl. ¶ 16.

### c.    Third Request for Accommodations

On September 16, 2011, McCullough returned to work from her second disability leave. McCullough Decl. at ¶ 18. McCullough again asked not to be placed in a quota-bearing territory immediately and to be removed from probation. *Id.* These requests were mostly denied. *Id.*

### 6.     McCullough's Final Internal Letter Regarding Discrimination, Followed by Termination

On September 19, 2011, McCullough sent a letter to Ursula Burns, Xerox's Chairperson and CEO, detailing her concerns of race and disability-based discrimination and retaliation at Xerox.  Compendium, Ex. 60.  McCullough copied Hicks on the letter, which echoed McCullough's prior complaints but provided more detail regarding alleged (1) unfair management of African-American employees; (2) discriminatory assignment of sales territories; (3) discriminatory treatment with respect to career advancement and PIP assignment; and (4) denial of her requests for disability accommodations.  *Id.*  McCullough wrote that she was very worried that her "discrimination concerns were not properly addressed and/or escalated to have them resolved." *Id.*  Further, she attributed the denial of her disability accommodation requests to retaliation for her December 2009 "Letter of Concern" addressed to Hogan.  *Id.*  This time, McCullough's complaint was investigated by Xerox's HR Operations Manager, Esther Gonzalez.  Declaration of Esther Gonzalez ("Gonzalez Decl."), ¶¶ 5-7, Ex. B.  After investigating McCullough's discrimination claims, Gonzalez concluded that they "had no merit whatsoever."  *Id.* ¶ 7.

On December 15, 2011, McCullough was terminated.  McCullough Decl. ¶ 20.

## IV.     LEGAL ANALYSIS

### A.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Only genuine disputes over material facts will preclude summary judgment; "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Material facts are those that may affect the outcome of the case.  A dispute as to a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Id.* at 254.  The question is "whether a jury could reasonably find either that the [moving party] proved his case by the quality and quantity of evidence required

by the governing law or that he did not." *Id.* "[A]ll justifiable inferences must be drawn in [the nonmovant's] favor." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (citation omitted). This is true where the underlying facts are undisputed as well as where they are in controversy. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 541 (1992); *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009).

The moving party must inform the district court of the basis for its motion and identify those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it contends demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Liberty Lobby*, 477 U.S. at 250. The opposing party need not show the issue will be resolved conclusively in its favor. *Liberty Lobby*, 577 U.S. at 248-49. All that is necessary is submission of sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the parties' differing versions at trial. *Id.*

The Ninth Circuit recently emphasized that it has "held in several cases that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 499 (9th Cir. 2015) (collecting cases and reversing grant of summary judgment for employer in FEHA disability discrimination case). The Ninth Circuit explained that "[t]his is because the ultimate question is one that can only be resolved through a searching inquiry —one that is appropriately conducted by a factfinder, upon a full record." *Id.* (citation omitted). In addition, in order to rebut an employer's showing of nondiscriminatory reasons at the pretext stage, a plaintiff opposing summary judgment "need produce very little evidence of discriminatory motive to raise a genuine issue of material fact." *Godwin v. Hunt Wesson, Inc.* 150 F.3d 1217, 1220 (9th Cir. 1998) (reversing grant of summary judgment for employer in FEHA sex discrimination case).

**B.   McCullough's FEHA Causes of Action are Time-Barred**

Xerox argues that it is entitled to summary judgment on all of McCullough's FEHA claims

11

United States District Court
Northern District of California

because they are time-barred as a matter of law.  The Court agrees.

### 1.   Statutes of Limitations Applicable to McCullough's FEHA Claims

McCullough's FEHA claims are governed by the statutory deadlines in Sections 12960 and 12965 of the California Government Code.  Under § 12960(d), an employee bringing a FEHA claim must exhaust her administrative remedies by filing an administrative complaint with the Department of Fair Employment and Housing ("DFEH") within one year of the alleged unlawful conduct.  Cal. Gov. Code § 12960(d).  Under § 12965(d), if DFEH decides not to pursue the claim raised by the employee, it must issue a right-to-sue letter notifying the employee that she may bring a civil legal action against her employer within one year of the date of the notice.  Cal. Gov. Code § 12965(d).  If the employee does not bring an action within the applicable one-year time period, she is barred from doing so later unless tolling applies.  *Acuna v. San Diego Gas & Elec. Co.,* 217 Cal. App. 4th 1402, 1416 (2013).

Section 12965(d) tolls the running of the one-year statute of limitations when DFEH defers investigation of a complaint to the Equal Employment Opportunity Commission ("EEOC").  Cal. Gov. Code § 12965(d)(1)(B).  The statute of limitations begins to run again when (1) the federal right-to-sue period expires, or (2) one year from the date of the right-to-sue notice by the DFEH, whichever is later.  Cal. Gov. Code § 12965(d)(2).

Under 42 U.S.C. § 2000e-(5)(f)(1), once a complaint is referred for investigation, the EEOC must issue a right-to-sue notice if it has not taken action by 180 days after the referral.  The employee then has 90 days from receipt of the notice to file a civil lawsuit.   When the record does not clearly reflect when the claimant received the notice, the Court extends the 90-day period by three days from the date of mailing.  *Payan v. Aramark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119, 1121 (9th Cir. 2007) ("in the absence of evidence of actual receipt, . . . a three-day mailing presumption [applies] to determine notice of a right-to-sue letter.").

### 2.   McCullough Did Not File Her FEHA Claims on Time

The undisputed facts establish that McCullough did not timely file her FEHA claims.  On April 3, 2012, McCullough submitted an administrative complaint to DFEH alleging discriminatory treatment, including wrongful termination, based on her "race, gender and/or

United States District Court
Northern District of California

1    disability."  Compendium, Ex. 61.  On April 11, 2012, DFEH notified McCullough that her

2    complaint was forwarded to the EEOC.  *Id.*  This notice triggered the beginning of the one-year

3    right-to-sue period under FEHA.  *Id.*  The following year, on March 22, 2013, the EEOC issued its

4    right-to-sue notice on McCullough's complaint, giving her ninety days from that date to file suit.

5    Compendium, Ex. 62.[5]  Because the EEOC right-to-sue deadline was later than the DFEH right-to-

6    sue deadline, the EEOC deadline controls for purposes of the statute of limitations analysis.  Cal.

7    Gov. Code § 12965(d)(2).

8        Under §12965(d) and 42 U.S.C. § 2000e-5(f)(1), McCullough thus was required to file any

9    civil action asserting the causes of action described in her April 2012 complaint no later than 90

10   days after the March 22, 2013 EEOC right-to-sue notice arrived at her address of record.  *See*

11   *Payan*, 495 F.3d at 1122.  McCullough testified that she has no reason to believe that the letter did

12   not arrive within "a day or two" after March 22, but does not know when she actually received the

13   notice.  McCullough Dep. 433:7-434:9, Dkt. No. 42-1.  Under these circumstances, the Court

14   applies a mailing presumption to extend the 90-day right-to-sue period by three days from the date

15   of issuance.  *Payan*, 495 F.3d at 1121.  "This presumption – that the plaintiff received the right-to-

16   sue letter by the date presumed under a three-day rule – is a rebuttable one," *id.* at 1126, and the

17   defendant bears the burden of proving that the plaintiff filed outside the limitations period.  *Id.* at

18   1122.

19       McCullough has not rebutted the three-day presumption.  "In reviewing whether the

20   presumption has been rebutted, courts look for evidence suggesting that receipt was delayed

21   beyond the presumed period."  *Id.* at 1126.  McCullough has produced no such evidence.  Instead,

22   she argues that her counsel sent unrelated correspondence in other matters to the same EEOC

23   office that issued the right-to-sue notice, and says that correspondence took "at least four days to

24

---

25   [5] While McCullough suggests that "by all appearances [the EEOC right-to-sue letter] was dated
26   March 27, 2013" (Opp. at 17), EEOC records and the letter itself establish beyond reasonable
     dispute that the letter was issued on March 22, 2013 and bears that date.  Compendium, Ex. 62;
27   Reply, Ex. B.  In this Circuit, courts "[b]egin with the presumption that the letter issuance date is
     also the date on which the letter was mailed."  *Payan*, 495 F.3d at 1123.  This presumption "may
28   be rebutted with evidence to the contrary," *id.* at 1124, but McCullough has produced no such
     evidence here.

arrive." Opp. at 18.  This argument does not rebut the presumption:  speculation about mailing times for unrelated correspondence in counsel's experience is not evidence.  *See Payan*, 495 F.3d at 1127 (proffered testimony that "delivery of mail is not always within 3 days [and that some] mail . . . was delivered 1 month after being sent out" "[s]hows nothing with respect to the receipt of the right-to-sue letter specifically, nor does it suggest a routine mail failure that necessarily would affect the right-to-sue letter").  Moreover, the timing of McCullough's *counsel's* possible receipt of the right-to-sue notice sheds no light on when *McCullough* received the notice, which is the relevant question.  *Payan*, 495 F.3d at 1122 (explaining that the start of the limitations period is measured from the date on which the right-to-sue notice letter arrived at the claimant's address of record).

Applying the 90-day deadline, and adding the presumptive three extra days, McCullough would have been required to file her claims by June 23, 2013, a Sunday.  By rule, the deadline was further extended to Monday, June 24, 2013.  Fed. R. Civ. P. 6(a)(1)(C).  Plaintiff did not file her Complaint until June 27, 2013 – three days past the deadline.  Not. of Removal at ¶ 2, Dkt. No. 1.  The Ninth Circuit has strictly enforced this statute of limitations, upholding the dismissal of claims as untimely when filed even a few days after the deadline.  *See Payan*, 495 F.3d at 1127 (affirming order dismissing as untimely *pro se* plaintiff's claims filed three days beyond the ninety-day deadline).   As a result, Defendant has met its burden of proving that McCullough's FEHA Causes of Action are time-barred, and is entitled to summary judgment as a matter of law on those claims.[6]

---

[6] McCullough submitted a previous DFEH complaint for which she received a right-to-sue notice on January 3, 2012.  Compendium, Ex. 55.  The right-to-sue period for that complaint expired in January 2013 without McCullough filing a lawsuit.  In an apparent effort to revive the expired claims from this earlier right-to-sue notice, McCullough argues that the continuing violations doctrine tolled the applicable statute of limitations until the expiration of the right-to-sue period associated with the second administrative complaint that she filed in April 2012.  *See* Opp. at 15-18.  As explained above, any claims stemming from any of McCullough's administrative complaints had to be filed by June 24, 2013 at the latest.  Because McCullough failed to file *any* civil suit by that deadline, any action asserting the prior DFEH claims would also necessarily be time-barred even if the continuing violation doctrine extended the limitations period as she claims.

United States District Court
Northern District of California

14

### C.   McCullough's Claim of Wrongful Termination Against Public Policy (Fourth Cause of Action) Narrowly Survives Summary Judgment

In addition to her FEHA claims, McCullough asserts a common-law tort claim for wrongful termination against public policy based on Defendant's alleged violations of FEHA. FAC ¶¶ 81-88.  Under California law, an employer cannot terminate an employee for a purpose that contravenes public policy.  *Foley v. Interactive Data Corp.,* 47 Cal. 3d 654, 667 (1988).  In order to support a claim of wrongful termination against public policy, Plaintiff must show that the allegedly violated policy is "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental."  *Stevenson  v. Superior Court*, 16 Cal. 4th 880, 897 (1997).  The public policy against disability and racial discrimination as reflected in FEHA is sufficient to form the basis of a common-law wrongful termination claim.  *City of Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1161 (1998); *Kap-Cheong v. Korea Express, USA, Inc.,* No. C 02-4041 CRB, 2003 WL 946103, at *5 (N.D. Cal. Feb. 12, 2003) ("Violations of FEHA and/or the California Constitution based on race/national origin discrimination are issues of fundamental state public policy and fall under this category.").  Unlike McCullough's FEHA claims, her wrongful termination claim is not subject to an administrative exhaustion requirement.  *Stevenson*, 16 Cal. 4th at 890 ("[A] plaintiff need not exhaust administrative remedies under FEHA before asserting a common law claim.").  However, to sustain a claim, Plaintiff must show that she meets the substantive requirements of FEHA.  *City of Moorpark*, 18 Cal. 4th at 1159.

Race-based employment discrimination is unlawful under FEHA.  *See* Cal. Gov. Code § 12940(a)-(d).  "Because state and federal employment discrimination laws are similar, California courts look to federal precedent when interpreting FEHA."  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 354 (2000).  "In particular, California courts use the familiar McDonnell Douglas burden-shifting test when analyzing disparate treatment claims under FEHA." *Earl v. Nielsen Media Research, Inc.,* 658 F.3d 1108, 1112 (9th Cir. 2011) (internal citations omitted).  Under this framework, generally the plaintiff must first establish a prima facie case of discrimination; then the burden shifts to the employer to show a "legitimate, nondiscriminatory reason" for the adverse

1    employment action; and finally the burden shifts back to the plaintiff to prove that the employer's

2    asserted reasons for the action are pretextual.  *Hanson v. Lucky Stores Inc.*, 74 Cal. App. 4th 215,

3    224 (1999).

4         In the context of a summary judgment motion in an employment discrimination action,

5    "the burden is reversed . . . because the defendant who seeks summary judgment bears the initial

6    burden."  *Dep't of Fair Employment & Hous. v. Lucent Technologies, Inc.*, 642 F.3d 728, 745

7    (9th Cir. 2011) (interpreting FEHA) (internal quotation marks and citations omitted);  *Hanson*, 74

8    Cal. App. 4th at 224.   That is, the defendant bears the initial burden to "show either that (1)

9    plaintiff [can] not establish one of the elements of the FEHA claim or (2) there [is] a legitimate,

10   nondiscriminatory reason for its actions."  *Lucent*, 642 F.3d at 745 (internal citations and quotation

11   marks omitted).   Therefore, in order to survive summary judgment, the plaintiff must

12   "demonstrate either . . . that the defendant's showing [is] in fact insufficient or . . . that there [is] a

13   triable issue of material fact to the defendant's showing."  *Id.* at 746 (quoting *Hanson*, 74 Cal.

14   App. 4th at 225).

15        Xerox argues both that (1) McCullough cannot establish each of the elements of a FEHA

16   claim; and (2) it had legitimate, nondiscriminatory reasons for terminating her.

17        **1.    McCullough Has Met Her Prima Facie Burden of Establishing the**
         **Elements of Her FEHA Claim**
18
         In order to establish a prima facie case of discrimination under FEHA, Plaintiff must show

19   that "(1) she belongs to a protected class, (2) she was performing according to her employer's

20   legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees

21   with qualifications similar to her own were treated more favorably."  *Godwin* 150 F.3d at 1220.

22   The degree of proof required to establish a prima facie showing on summary judgment is

23   "minimal."  *Id.*   Xerox argues that McCullough cannot make a prima facie showing as to the

24   second element of her FEHA claim:  that she was performing her job according to her employer's

25   legitimate expectations.  Mot. at 18.

26        McCullough's evidence on this point satisfies her "minimal" prima facie burden.

27   McCullough has produced evidence that she met sales quotas for 2001 through 2003 and 2005,

28

         United States District Court
         Northern District of California

                                    16

1    and received awards for her performance during that time.  Stasher Decl. ¶ 3; McCullough Decl. ¶

2    3.  She achieved 116% of her sales quota for a single quarter while on probation in 2009, and

3    achieved 221% of her sales quota for the month of October 2010 before returning to disability

4    leave.  McCullough Decl. ¶¶ 6, 16.  While the parties' dueling versions of the relevant facts will

5    no doubt be heavily contested at trial, McCullough has made a sufficient showing to meet her

6    prima facie burden at this stage.

### 2. Xerox Has Articulated Legitimate Non-Discriminatory Reasons for McCullough's Termination

8        Xerox next contends that it had "legitimate, non-discriminatory reasons" for terminating

9    McCullough.   Xerox points to the following bases for terminating McCullough: (1) customer

10   complaints that McCullough "lacked responsiveness," did not "follow up," had "poor

11   communication" with customers, and did not follow "directives for receiving signature approval,"

12   (Stasher Decl. ¶ 4-7); (2) McCullough's violation of company policy by working a full-time job at

13   Weight Watchers while still employed with Xerox (McCullough Dep. 87:18-88:20; 95:5-20, Dkt.

14   No. 42-1; Compendium, Ex. 11); (3) McCullough's failure to meet sales expectations after 2007

15   (Stasher Decl. ¶ 9-13); and (4) her poor sales performance generally (Hogan Decl. ¶ 9; Stasher

16   Decl. ¶; Alvarez ¶ 35).  The Court finds that Xerox has satisfied its burden as to this factor by

17   articulating its reasons, and McCullough does not appear to argue to the contrary.

### 3. McCullough's Rebuttal Evidence Narrowly Establishes a Triable Issue of Fact Regarding Pretext

20       Because Xerox has articulated facially nondiscriminatory reasons for terminating

21   McCullough, the burden shifts back to Plaintiff to show that Xerox's asserted reasons amount to

22   pretext.  *Hanson*, 74 Cal. App. 4th at 224.

23       Plaintiff relies on circumstantial evidence to support her contention that Xerox's decision

24   to fire her was motivated by discrimination.  Although the Ninth Circuit has stated that "the

25   circumstantial evidence relied on by the plaintiff must be 'specific' and 'substantial,'" "there is

26   some question whether that distinction for circumstantial evidence is valid after the Supreme

27   Court's *Costa* decision which placed direct and circumstantial evidence on an equal footing."

28   *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015) (*discussing Godwin*, 150 F.3d at 1222).

United States District Court
Northern District of California

17

1   In any event, the Ninth Circuit has consistently held that "a plaintiff's burden to raise a triable

2   issue of pretext is hardly an onerous one."  *Earl*, 658 F.3d at 1113 (internal quotation marks

3   omitted).

4        While it is a very close question, the Court finds that McCullough has presented enough

5   evidence to create a triable issue of fact as to her claim of wrongful termination in violation of

6   public policy.  McCullough has presented evidence which, if believed by a jury, could support a

7   conclusion that: (1) even though she was meeting sales expectations in 2003, Xerox split her sales

8   territory with a white employee (McCullough Dep. at 169:20-22, Dkt. No. 51); (2) both she and

9   her African-American supervisor were placed and maintained on probation even though their work

10  performance was similar to or better than that of their white counterparts (McCullough Decl. ¶ 6;

11  Stasher Decl. ¶ 13; Stasher Dep. at 67:17-70:2, Dkt. Nos. 42-1, 51); (3) she was not evaluated by

12  the same standards as her white colleagues when placed in comparable territories (McCullough

13  Decl. ¶ 5; Compendium, Exs. 52, 60, 61, 63); (4) some of her complaints of racial and disability-

14  based discrimination were not investigated or appropriately addressed (McCullough Decl. ¶ 10;

15  Hogan Decl. ¶ 15); (5) she was managed differently under her PIP than at least one other white

16  colleague, Catherine Mathews, who was removed from a PIP after meeting her quota for a single

17  quarter (Compendium, Ex. 60; Stasher Decl. ¶ 18(a)); and (5) her requests for disability

18  accommodations were consistently rejected, while comparable accommodations were afforded to

19  non-disabled white employees.  (McCullough Decl. ¶ 5; Compendium, Ex. 63).

20       Xerox argues that McCullough's evidence regarding her evaluation, PIP management and

21  territory and quota assignments as compared to her white colleagues is insufficient to raise a

22  triable issue of material fact because the law requires employees to be "similarly situated" for

23  allegedly disparate treatment of employees to raise an inference of discrimination.  Reply at 8

24  (*quoting Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003)).  The Court agrees

25  that this is the correct legal standard, but whether McCullough and her counterparts were in fact

26  "similarly situated" is a highly fact-intensive inquiry that cannot be decided in Defendant's favor

27

28

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1    at this stage on this record. [7]  For example, McCullough presents evidence that she and her white

2    co-workers, Catherine Mathews and Dave Roberts, performed the same types of job functions,

3    were managed by the same supervisor, and at least as to Matthews were evaluated on the same

4    criteria (primarily customer sales).  Stasher Decl. ¶¶ 18, 19; *see* Compendium, Ex. 110

5    (performance report indicating performance/sales levels and reflecting same department title for

6    McCullough and Matthews).  Similarly, Xerox's contention that Stasher's creation of a "special

7    assignment" for Roberts means that he could not have been similarly situated to McCullough,

8    Reply at 8-9, is precisely the type of fact-intensive question best resolved by a jury on a full

9    evidentiary record.  *Hawn v. Executive Jet Mgmt., Inc.,* 615 F.3d 1151, 1157 (9th Cir. 2010)

10   ("[W]hether employees are similarly situated—*i.e.,* whether they are similar in all *material*

11   respects —is a fact-intensive inquiry, and what facts are material will vary depending on the

12   case.") (internal quotation marks and citations omitted).

13          For these reasons, the Court finds that, viewed as a whole, McCullough's evidence

14   establishes that triable issues of material fact exist regarding Defendant's claimed non-

15   discriminatory reasons for her termination.  The Court does not doubt that Xerox has presented

16   substantial facts which, if believed by a jury at trial, will constitute a strong defense to

17   McCullough's claim.  But the Ninth Circuit has repeatedly held in no uncertain terms that in fact-

18   intensive discrimination cases "the ultimate question is one that can only be resolved through a

19   searching inquiry -- one that is most appropriately conducted by a factfinder, upon a full record."

20   *Nigro*, 784 F.3d at 499.  In light of this guidance, the Court finds that McCullough has narrowly

21   met her burden with regard to her claim for wrongful termination against public policy, and thus

22

23   [7] Throughout its briefing, Xerox consistently and openly urges the Court to weigh the evidence
     and resolve evidentiary conflicts in its favor.  *See, e.g.,* Mot. at 19 (arguing that witness "denies
24   saying" what McCullough says he said); Mot. at 20 (asserting that McCullough "ignores the
     evidence" (citing a declaration by one of Xerox's witnesses) that white employee was not
25   similarly situated to plaintiff); and Reply at 8 n.9 (arguing that McCullough's evidence is "flatly
     contradicted by the admissible evidence").  Accepting Xerox's invitation obviously would be
26   improper at the summary judgment stage, when the Court must resolve all conflicts, and draw all
     inferences, in *Plaintiff's* favor.  *See Chuang v. Univ. of California Davis, Bd. of Trustees,* 225 F.3d
27   1115, 1129 (9th Cir. 2000) ("It is not the province of a court to spin such evidence in an
     employer's favor when evaluating its motion for summary judgment.  To the contrary, all
28   inferences must be drawn in favor of the non-moving party.").

1    DENIES Defendant's motion for summary judgment as to that cause of action.

2        **D.    Declaratory Relief (Third Cause of Action)**

3        Plaintiff's Third Cause of Action seeks a declaration pursuant to California Code of Civil

4    Procedure § 1060 that her race and engagement in protected activities were a substantial

5    motivating factor for the Xerox's decision to terminate her employment.  FAC ¶ 77.  As an initial

6    matter, the Court finds that the federal Declaratory Judgment Act, rather than the California

7    statute, governs in this case.[8]

8         "To fall within the Act's ambit, the case of actual controversy must be definite and

9    concrete, touching the legal relations of parties having adverse legal interests," and it must be "real

10   and substantial and admi[t] of specific relief through a decree of a conclusive character, as

11   distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

12   *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007) (internal citations and quotation

13   marks omitted).   The Court finds that Plaintiff's claim for declaratory relief meets this standard.

14   Further, for the reasons discussed above, McCullough has put forth sufficient evidence to raise a

15   disputed issue of material fact as to Defendant's motives that, if resolved in her favor at trial,

16   could justify the requested declaration.  Whether this cause of action is "redundant" can be

17   addressed at trial if necessary.  For these reasons, Defendant's motion for summary judgment on

18   Plaintiffs' Third Cause of Action is DENIED.

19       **E.    Punitive Damages**

20       Under California law, a plaintiff is entitled to punitive damages where she can show by

21   "clear and convincing evidence[] that the defendant has been guilty of oppression, fraud, or

22   malice." Cal. Civ. Code § 3294.   Where the defendant is a corporation, the evidence must

23   demonstrate that an officer, director or managing agent of Defendant committed, authorized or

24

25   [8] Generally, federal courts sitting in diversity apply federal procedural rules.  *See In re Adobe Sys.,
     Inc. Privacy Litig.,* 66 F. Supp. 3d 1197, 1219 (N.D. Cal. 2014) (collecting cases and holding,
26   based on the procedural nature of the Declaratory Judgment Act, that where declaratory relief is
     requested in federal court the federal statute applies).  Accordingly, the Court will analyze
27   McCullough's third cause of action under the federal standard.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  ratified an act of malice, oppression or fraud.  *Id.;* see also *White v. Ultramar, Inc.*, 21 Cal.4th

2  563, 572 (1999).  A "managing agent" is defined as an employee "who exercise[s] substantial

3  independent authority and judgment over decisions that ultimately determine corporate policy."

4  *White*, 21 Cal.4th at 573.  "The scope of a corporate employee's discretion and authority" is "a

5  question of fact for decision on a case-by-case basis."  *Id.*  However, typically "supervisory

6  employees" are not considered managing agents under § 3294 unless they exercise "substantial

7  discretion" in their decision-making capability.  *Id.*

8        Depending on how the evidence comes in at trial, a reasonable trier of fact could conclude

9  that Hogan, Stasher and Alvarez exercised substantial discretion in supervising Plaintiff,

10  investigating her complaints of discrimination, and building and altering her sales territories.

11  Stasher Decl. ¶ 13; McCullough Decl. ¶ 6; Stasher Dep. 46:2-24, 47:21-49:8, Dkt. No. 51; Riles

12  Decl., Ex. 12 ("Conville Dep.") at 62:12-63:8, 63:22-67:25, Dkt. No. 52.  In addition, the

13  motivation of McCullough's managers in deciding to terminate her is an inherently fact-intensive

14  inquiry to be resolved by a jury, and Xerox has not presented any argument that would entitle it to

15  summary judgment on the punitive damages claims as a matter of law at this stage.

16        Because Plaintiff's wrongful termination claim survives summary judgment, the Court

17  finds it would be premature to dismiss her request for punitive damages.  Accordingly, the Court

18  DENIES summary judgment on Plaintiff's prayer for punitive damages.

19  **V.    CONCLUSION**

20        Having considered the evidence in the light most favorable to Plaintiff, the Court

21  GRANTS Defendant's motion for summary judgment as to McCullough on her First, Second,

22  Fifth, Sixth and Seventh Causes of Action.  The Court DENIES summary judgment on Plaintiff's

23  Third and Fourth Causes of Action and on her prayer for punitive damages.

24        **IT IS SO ORDERED.**

25  Dated:   10/2/2015

26

27  HAYWOOD S. GILLIAM, JR.
    United States District Judge

28